Peter **FRATTAROLI** and Enrico P.
Ventresca, Petitioners,

v.

**NATIONAL LABOR RELATIONS
BOARD et al., Respondents.**

No. 75–1085.

United States Court of Appeals,
First Circuit.

Argued Sept. 8, 1975.

Decided Dec. 18, 1975.

John P. Flynn, Braintree, Mass., with whom Murphy, Lamere & Murphy, Braintree, Mass., was on brief, for petitioners.

Allison W. Brown, Jr., Washington, D. C., Atty., with whom John C. Miller, Acting Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Alan D. Cirker and Sandra Shands Elligers, Washington, D. C., Attys., were on brief, for respondent N. L. R. B.

Alan J. McDonald, Boston, Mass., with whom James T. Grady and Grady & Kaplan, Boston, Mass., were on brief, for Boston Cement Masons & Asphalt Layers Union Local No. 534, intervenor.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, THOMSEN, Senior District Judge.[*]

---

LEVIN H. CAMPBELL, Circuit Judge.

This is a petition for review of an order of the National Labor Relations Board dismissing an unfair labor practices complaint. Discharged by Duron Maguire Easton Corporation, petitioners Peter Frattaroli and Enrico Ventresca each filed charges against the Boston Cement Masons & Asphalt Layers Union, Local No. 534, claiming violations of sections 8(b)(1)(A) and 8(b)(2) of the Labor Management Relations Act.[1] The Board's General Counsel ordered the cases consolidated and issued a complaint alleging that the Local had demanded, as a requirement for petitioners' continuous employment, "an exaction of money which was not an initiation fee or dues," and had caused Duron Maguire to refuse to hire petitioners because of their failure to pay the demanded sum.[2] After a full hearing, the Administrative Law Judge concluded that unfair labor practices had been proven. The Board disagreed and ordered the complaint dismissed in its entirety. As we do not find substantial evidence to support this

---

[*] From the District of Maryland, sitting by designation.

1. 29 U.S.C. §§ 158(b)(1)(A) and (b)(2). Section 8(b)(1)(A) forbids unions to restrain or coerce employees in the exercise of their right under section 7, 29 U.S.C. § 157, to join or refrain from joining a labor union.

Section 8(b)(2) forbids unions to cause or attempt to cause such employer discrimination as is proscribed by section 8(a)(3), 29 U.S.C. § 158(a)(3). Section 8(a)(3), while permitting employers to enforce union security agreements that require employees to become union members a certain number of days after being hired (seven days in the construction industry, section 8(f)(2), 29 U.S.C. § 158(f)(2)), generally forbids discrimination that encourages or discourages union membership and specifically prohibits closed shop arrangements under which non-union employees are refused work on grounds other than nonpayment of dues or fees uniformly required of union members. See note 2 infra.

Section 8(a)(3)'s prohibition of the closed shop has been held not to reach either the agency shop, NLRB v. General Motors Corp., 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963), or the exclusive hiring hall, see Local 357, Teamsters v. NLRB, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961). The latter is in any event permitted in the construction industry by section 8(f)(3), 29 U.S.C. § 158(f)(3).

2. The General Counsel apparently framed the complaint with a view toward the following interpretation of section 8(a)(3), see note 1 supra:

"[T]he 1947 amendments [to the Labor Management Relations Act] not only abolished the closed shop but also made significant alterations in the meaning of 'membership' for the purposes of union-security contracts. Under the second proviso to § 8(a)(3), the burdens of membership upon which employment may be conditioned are expressly limited to the payment of initiation fees and monthly dues. It is permissible to condition employment upon membership, but membership, insofar as it has significance to employment rights, may in turn be conditioned only upon payment of fees and dues. 'Membership' as a condition of employment is whittled down to its financial core. . . ."

NLRB v. General Motors Corp., 373 U.S. 734, 742–43, 83 S.Ct. 1453, 1459, 10 L.Ed.2d 670 (1963).

order, we vacate and remand for further proceedings.

Duron Maguire was constructing the Shawmut Bank building in Boston. Under an agreement between Local 534 and the Associated General Contractors of Massachusetts (AGC), Local 534 was recognized as the exclusive bargaining agent for cement masons working on AGC projects in Boston. As a member of AGC, Duron Maguire was obligated under Article V of the contract (1) "to notify [Local 534] of all opportunities for employment prior to the filling of job vacancies in order that [Local 534] may refer qualified applicants as hereinafter defined, for such employment"; and (2) "to hire only qualified cement masons whose minimum training includes completion of [a state approved] Apprentice Program as a cement mason as evidenced by a certificate of completion, or its equivalent. . . ."

Petitioners Frattaroli and Ventresca were not members of Local 534, but belonged instead to separate locals of the Bricklayers, Masons and Plasterers International Union of America. Both were journeymen cement masons of long standing, and both had worked previously under Local 534's jurisdiction.

The present dispute arose when petitioners were hired directly by Duron Maguire to work on the Shawmut Bank building. Through its foreman, the employer had first contacted the two men and had then called Local 534 to announce that it was bringing in two outsiders and to request that specific members of Local 534 be referred to fill the remaining available jobs. The Local produced the named members, but protested the hiring of petitioners. Petitioners were nonetheless hired and worked for two days. At the beginning of a third, after a week in which no cement work was done, Local 534 threatened to strike unless petitioners were replaced, and the employer acquiesced. The two replacements were members of Local 534.

Acting for the Board's General Counsel at the hearing, petitioners put on evidence tending to show that Local 534 had demanded their replacement on the ground of dues delinquency—specifically, delinquency in paying a demanded sum of 2 percent of take-home pay per month. By testimony that Ventresca had offered to pay the 2 percent fee in exchange for membership and had been turned down, petitioners attempted to prove that the fee was not dues uniformly required as a condition of acquiring membership in Local 534, and that membership was not available to them on an equal basis. Petitioners also attempted to prove that, in any event, Frattaroli was not delinquent, owing the union at most a $14 fine.

Local 534 did not deny demanding the 2 percent charge from both men, but attempted to prove through its assistant business agent John O'Neil that the charge was a legitimate service fee and, in the alternative, that the Local's real motive in seeking petitioners' replacement was not their delinquency in paying the 2 percent fee, but rather the employer's violation of the collective bargaining agreement in hiring them.

The Local rested its service fee argument on a letter purporting to confirm an agreement between the Bricklayers and the Cement Masons to the effect that a member of either union would be required to pay, while in the other's jurisdiction, "service fees equivalent to the dues and working assessments to the local union each month less the international per capita tax of the international union in whose jurisdiction he would be working or seeking work." This was corroborated by uncontested evidence that Local 534 charged its own working members 2 percent of take-home pay per month and that the Cement Mason's per capita tax was $4.50 per month. Petitioners responded by arguing that the letter did not show an actual agreement and that, in any case, Local 534 had made no provision for enforcement of any such agency shop arrangement in

the union security clause of its collective bargaining agreement.[3]

In urging alternatively that petitioners had been hired in violation of the collective bargaining agreement, Local 534 claimed two infractions: (1) that it had not been notified of all job opportunities; and (2) that Frattaroli and Ventresca were not "qualified" under the contract since they had never completed a certificated apprentice program. These claims too were disputed, petitioners arguing both that notification had been adequate and that, as journeymen cement masons, their training necessarily included the "equivalent" of completion of an apprentice program.

The Administrative Law Judge resolved all the major hearing issues in petitioners' favor. He found that Local 534 had failed to prove any agreement between the Bricklayers and the Cement Masons that would explain the 2 percent fee, that there had been no failure to notify, since Local 534 had been "informed as to the number of jobs which would be filled," and that petitioners were qualified under the accepted interpretation of the contract phrase "or its equivalent." He concluded,

> "In this case Respondent [Local 534] threatened the Company with a strike if it continued to employ journeymen who were denied membership in respondent while being told they must pay "dues" and "fines" to respondent in order to work in its claimed geographical jurisdiction. None of Respondent's defenses negate its actions which I conclude and find violate Sections 8(b)(1)(A) and (2) of the Act."

In reaching a contrary conclusion, the Board confronted none of the issues that had been the focal points of the hearing.

The Board focused, instead, on whether the collective bargaining agreement gave Local 534 the right to operate an exclusive hiring hall, an issue which had been glossed over at the hearing, but which the Administrative Law Judge had resolved in petitioners' favor as a means of buttressing his finding that there had been no contract violation.

Reformulating what had been independent strands of Local 534's defense, the Board found not only that the Local was entitled to have an exclusive hiring hall, but that it was presumptively entitled to charge non-members 2 percent of take-home pay per month as a fee for its employment service. This permitted the further finding that the Local would have been within its rights in demanding petitioners' replacement *either* because they had bypassed the exclusive referral system *or* because they had failed to pay for its cost. Since the 2 percent fee could legitimately have been made a condition of employment, the allegations of the complaint were fatally defective: "[I]n the absence of any allegation that the Union charged excessive or discriminatory fees as a condition of referral to employment or for continued employment, we find that no violation has been alleged." While this was enough to justify dismissal, the Board found an independent basis for decision in the evidence adduced at the hearing. For in the Board's opinion, the motive for Local 534's insistence that petitioners be replaced was not the failure to pay, but the bypass of the exclusive hiring hall:

> "While there is testimony concerning the payment of money by Frattaroli, and a refusal by Ventresca to pay the 2-percent service fee unless he was made a member, we do not believe that Frattaroli and Ventresca were de-

---

**3.** The agreement provided:

"All employees who are members of the Union on the effective date of this Agreement shall be required to remain members of the Union as a condition of employment during the term of this Agreement. New employees shall be required to become and remain members of the Union as a condition of em-

ployment, from and after the seventh day following the date of their employment, or the effective date of this Agreement, whichever is later."

Compare the provision approved in *NLRB v. General Motors Corp.*, 373 U.S. 734, 735 n. 3, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963).

nied clearance or referral because of their lack of membership in the Respondent Union, but because local men in the area were out of work and Frattaroli and Ventresca had not utilized the Union's referral system. In sum, we believe that the evidence shows that the motivation underlying the Respondent Union's protest of the hiring of Frattaroli and Ventresca was the Employer's failure to give it the opportunity to refer qualified employees in accordance with the contractual referral system and that by protesting the hiring of Frattaroli and Ventresca the Union was merely policing and enforcing the terms of its collective-bargaining agreement with the Employer." (footnote omitted)

■ We review the Board's decision with deference to its expertise as well as with appreciation that its findings must stand if supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Thus on whether the contract language should be construed to confer upon Local 534 a right to operate an exclusive referral system, we might expect to give very considerable weight to the Board's reading of the terms of the agreement.[4]

· [2] But even if we assume that the collective bargaining contract should be read to provide for an exclusive referral system, we are faced with the absence of substantial evidence in the record that at the time Frattaroli and Ventresca were hired, and the dispute at issue took place, Local 534 was operating an exclusive hiring hall. The Local could not demand the replacement of petitioners for bypassing a hiring mechanism it did not in fact provide, nor could the Board reasonably require the complaint to anticipate that the fee demanded was for a service the Local did not in fact render. Not only is there no affirmative evidence of an operative exclusive hiring hall; the Union's evidence suggests that, however existing arrangements could be characterized, they fell considerably short of any such exclusive referral arrangement.

At the conclusion of the evidence, petitioners, acting for the General Counsel, moved to amend their complaint to allege that the union had administered "an employment referral hall in a discriminatory manner." Counsel for the union objected in these terms:

"We're not trying a hiring hall case. W'ere [sic] not prepared to try a hiring hall case. If we were I'd have all the records. After the parties both have rested to amend the complaint, to cover a matter that was brought up as speculation as to how this thing operates, in a peripheral issue to the main thrust, which involves two employees and a date in question, the 16th of July '73 would be highly prejudicial to the local union. To have at this time,

---

4. The Board relied on similarity between the contract language by which Duron Maguire, as a member of AGC, agreed "to notify [Local 534] of all opportunities for employment prior to the filling of job vacancies in order that [Local 534] may refer qualified applicants, as hereinafter defined, for such employment," and the language in section 8(f)(3) of the Labor Management Relations Act, which provides that it is not an unfair labor practice in the construction industry to adopt a provision that "requires the employer to notify [the] labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment . . . ." From clear legislative history showing that section 8(f)(3) was intended to permit exclusive hiring hall agreements, 1959 U.S.Code Cong. & Admin.News, pp. 2318, 2345, 2442, the Board inferred that the adoption of similar language in the collective bargaining agreement must signal the intent to be bound to an exclusive hiring hall.

While we find this reasoning persuasive as far as it goes, we note that in determining the nature of contractual referral arrangements in the past, the Board has been less concerned with the language in the agreement than with how the hiring hall operated in practice. *E. g., Local 673 Laborers (Perini Corp.)*, 171 N.L.R.B. 894 (1968). In this case, as discussed elsewhere, there is an absence of evidence that an exclusive hiring hall was in operation or, indeed, that the Union was asserting any right to operate one.

without a charge being filed, to have to rest on evidence that it didn't even have an opportunity to present concerning how the hall is administered. *It isn't even a hall, not in the sense of the legal, technical hard sense of what a hiring hall is.*" (emphasis added) The Administrative Law Judge denied the motion to amend, agreeing with counsel for the union that "the operation of a hiring hall . . . is in a different category from what the nature of these charges are."

An examination of the evidence presented at the hearing explains why all concerned thought the hiring hall issue unimportant. For the referral hall described by the union's only witness, its assistant business agent O'Neil, could not fairly be characterized as a system, much less as an exclusive system. O'Neil voiced three objections to the hiring of Frattaroli and Ventresca, none of which depended on an exclusive hiring hall agreement. He believed that the two men were delinquent in paying the 2 percent fee required by the purported Bricklayers-Cement Masons agreement that notification of the job opportunities they filled had been inadequate, and that neither man was qualified under the contract. To be sure the notification and qualification objections were both tied to the right to refer employees for jobs. But O'Neil's understanding of the referral right seems to have fallen far short of the right found by the Board.

O'Neil admitted on cross-examination that the Local had been informed of "the personnel, and how they were going to be put on the job . . .", but insisted that there had been inadequate notification of how many jobs would be available each day. The Local's interest in having this information seems to have derived from the requirement that only qualified employees be hired. O'Neil

considered all members of Local 534 to be qualified, most of them by completion of a state-backed apprentice program, the rest—older men—by simply having apprentice training. He considered outsiders on the other hand, and members of the Bricklayers in particular, to be at worst unqualified and at best less qualified than his own men under the priority terms of the contract.[5]

Thus if an opening were known to the Local in time for unemployed Local men to be referred, they would nearly always have to be hired in preference to outsiders. This was not to say that only men referred by the Local could be hired, as the Board found, but that—by and large—only Local men could be hired if Local men were made available prior to the filling of jobs. As viewed by O'Neil, therefore, the referral right could be meaningful, contrary to the assumption of the Board, even if it were not exclusive.

When asked whether the union operated "any kind of hiring hall," O'Neil gave the following response:

"Each day *members* will call in that they're unemployed. Contractors will call in, and request if their men had been on the job previously, if they were satisfied with the guy's work. We have a list, and the easiest way for a contractor to secure people is by calling the union hall. Sometimes they do call people. They inform us that they called a person direct, that he's going to work for them. You know, is it all right with us, and so forth. . . ." (emphasis added)

We do not believe that the described arrangement can be considered an exclusive referral system, especially in the absence of any indication in the record that outsiders were ever hired through referral by Local 534 or that the Local had

---

5. The agreement provided,

"If all the cement masons who have completed an accredited Apprentice Program or its equivalent, have been hired and there are still job vacancies, [the employer] agrees to hire the applicants with the longest length of service as a cement mason in the following order;

First: with the particular employing contractor; Second, In the geographical area defined in Article XII [Local 534's jurisdiction]; and Third: in the industry."

ever objected to the practice of hiring outsiders directly.[6]

■ Since we find no evidence in the record to support a finding that Local 534 operated a referral hall for the benefit of anyone not a member, we see no reasonable basis for the Board's conclusion that the petitioners' bypass of the hiring hall provided the motive for the union's insistence that they be replaced. Not only does the Board's conclusion seem to us unfounded, it flies in the face of its examiner's finding, based on a firsthand evaluation of testimony and not in any way discredited, that the union advanced its contentions of contract violations as a cloak to cover a discriminatory attempt to exact dues equivalencies from petitioners. *Cf. Ward v. NLRB*, 462 F.2d 8 (5th Cir. 1972).

■ Nor do we think the Board's alternative conclusion, that the complaint failed to state a violation of sections 8(b)(1)(A) and 8(b)(2), can stand. The Board thought it insufficient for a complaint to charge only that "an exaction of money which was not an initiation fee or dues had been demanded as a condition of employment," because such a complaint failed to exclude the possibility that the sum exacted was a "reasonable hiring hall fee." But if the union offered no employment service to outsiders, there can be no reason to require the complaint to anticipate that the union would claim that a fee for such service was justified. Moreover, it is scarcely self-evident that the use of the phrase "initiation fee or dues," in the complaint does not encompass all fees that a union can legitimately charge as a condition of employment, including a "reasonable hir-

ing hall fee." The Union's witness O'Neil used the terms "dues" and "service fees" interchangeably in his testimony.

We find it difficult, moreover, to understand why the Board should rely on this purported defect[7] in pleading after the evidence was all in and the examiner had made extensive findings. *Cf. NLRB v. Puerto Rico Rayon Mills, Inc.*, 293 F.2d 941, 947–48 (1st Cir. 1961) (enforcing an order based on a theory of violation not alleged but fully litigated). To be sure, the parties might have done a better job of sorting out their claims and defenses before the hearing. But the Board has hardly helped matters by simply dropping without refutation its examiner's central findings in its eagerness to resolve an issue that both parties, at least until the end of the hearing, considered peripheral to the dispute.

We therefore remand to the Board for reconsideration. The Board may, if it desires, reopen the record; possibly, the Board may yet find substantial evidence to support conclusions that, on the present record, we have been unable to accept.

The most serious deficiency of the present decision is the lack of any clear relationship between the Board's ultimate conclusions, its examiner's findings of fact, and the record as a whole. These discontinuities make judicial review difficult, render the foundations of the Board's opinion doubtful, and leave both union and employer without specific guidance on acceptable conduct in hiring and collecting fees from non-union employees. We trust that the Board will be able in the course of reconsideration

**6.** We reject the Board's suggestion that the evidence of union practice and interpretation presented at the hearing can be dismissed as showing only a failure "in the past to insist upon rigid enforcement of the provisions of the agreement. . . . " Petitioners can scarcely be expected to have recognized a system which the union itself did not recognize; nor can the fees in question be justified on a ground of which the party demanding them was oblivious. On whether the referral hall

was exclusive, the record shows no change in the union's understanding through the time of the hearing.

**7.** Before the hearing an Administrative Law Judge, other than the one who later presided, ruled that the allegations in the amended complaint "more than adequately meet the specificity requirements of Section 102.15 of the Board's Rules and Regulations [29 C.F.R. § 102.15]."

to pull together the facts and the conclusions it reaches into a more coherent whole.

*The petition for review is granted. The order of the Board is vacated and the case remanded for further proceedings consistent with this opinion.*