## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## JACK AUGUST ENTERPRISES, INC., Respondent.

### No. 78–1001.

United States Court of Appeals, First Circuit.

Argued May 2, 1978.

Decided Sept. 22, 1978.

Bernard P. Jeweler, Baltimore, Md., Atty., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and William R. Stewart, Atty., Washington, D.C., were on brief, for petitioner.

Richard D. Hayes, Springfield, Mass., with whom Sullivan & Hayes, Springfield, Mass., was on brief, for respondent.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

This is a petition for enforcement of a Board order which adopted the opinion and order of the administrative law judge, reported together at 232 N.L.R.B. No. 138 (1977). The issues presented are: (1) whether there is substantial evidence to support the Board's findings of unfair labor practices by the respondent, (2) whether the proceedings before the administrative law judge were so infected with improprieties, bias and denial of due process so that enforcement of the Board's order should be denied.

The administrative law judge found that the company violated sections 8(a)(3) and (1) of the National Labor Relations Act [1] by changing the work schedule and reducing the work hours of employee Jane Goulet and then discharging her because of her union activity and in order to discourage union activity. He found that employee Charlotte Manegre was discharged at the same time as Goulet in order to cover up the reasons for Goulet's discharge.

In addition to the unlawful discrimination charges, the administrative law judge found that the company violated section 8(a)(1) of the Act by coercively interrogating an employee concerning disclosures made to a Board agent during the investigation of the unfair labor practice charge, threatening employees with closing the restaurant, making threats of other reprisals, using coercive behavior and intimidation towards employees, and maintaining an overly broad and improper rule prohibiting union solicitation on the premises.

## THE FACTS

Respondent, a Massachusetts corporation, operates a chain of restaurants in Massachusetts and Connecticut. The restaurant, which was the stage for this case, is located in Springfield, Massachusetts. It opened in October of 1972 and had approximately sixty employees working on two shifts. The restaurant consisted of a chowder house, a steak house, a bar and a kitchen.

Jane Goulet, the employee who is the focus of the case, was hired as a waitress at the time the restaurant opened. She was promoted to head waitress in the chowder house in May or June of 1973. She held that position until the late fall of 1974, when the manager of the restaurant, Roger Provost, was transferred and the new area supervisor, Sheldon Rappaport, abolished the position. Goulet continued to work a twenty-five hour week in the chowder house.

About the middle of July, 1975, Goulet, together with waitresses Linda Symington and Sharon Dalton started union organiza-

---

1. (a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

.    .    .    .    .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership, . . . 29 U.S.C. § 158(a)(1) and (3).

tional activities. Authorization cards were obtained from the office of the local affiliate of Hotel and Restaurant Employees Union, AFL–CIO. Twenty-six signed cards were obtained and submitted to the Union on or about July 29. That same day, the Union filed a representation petition with the Board and wrote to the respondent asking recognition.

During the same time period, Goulet and Dalton, after having completed their duties, solicited two employees in the kitchen area. The testimony was that this lasted about one minute. Manager Provost, who was back in this restaurant,[2] sent letters to the homes of both on August 5 reprimanding them for interrupting the work of two employees. At this time, the company had no rule or announced policy as to solicitation. Shortly after he sent the letter, Provost posted its contents on the restaurant bulletin board as a "Notice of Warning." Provost and the president of the respondent corporation, Mervin Rubin, addressed an employer-called meeting of all of the restaurant employees at which they were told by Provost that they could withdraw their authorization cards by writing to the Union at an address which he would furnish. A few days later, Dalton had a lengthy conversation with Provost about her role in the organizing drive and stated that she wanted to withdraw and that it was Goulet and Symington who had been the instigators. Provost asked her if she would be willing to state this to Rubin. Dalton agreed, but on the condition that Symington accompany her to the meeting with Rubin. Dalton and Symington met with Rubin. Dalton stated that she was afraid of losing her job because of union involvement. Symington said that she, too, no longer wanted to be involved with the Union. Rubin told them that he was glad that they had come, that Dalton no longer had to fear for losing her job, and explained how their union solicitation cards could be withdrawn. Both requested the Union that their solicitation cards be withdrawn. Seven other employees followed suit within a short time.

Around the middle of August, 1975, Provost told the head waitress in the chowder house to change the working schedule of Goulet. Normally, Urban, the head waitress, used her own discretion in scheduling, but Provost specifically told Urban to schedule Goulet only three nights a week instead of four, to eliminate weekends, and to reduce her hours to four per night. Goulet, who had hitherto worked twenty-five hours a week, was now limited to sixteen, and this shrank to eleven or twelve by the end of the year. There were ten or eleven other chowder house waitresses, many of whom had less seniority than Goulet, but none of them had their working hours shortened.

Up until the Union activity, Goulet had never been reprimanded for her job performance. She was regarded as an excellent waitress. In September of 1975, Provost orally criticized Goulet for a "snotty" attitude and not smiling enough at work. She was told by Provost that she headed Rubin's list of those to be let go.

On September 17, Goulet, at her request, had a face-to-face meeting with Rubin so she could discuss the changes in her work schedule. Rubin tape-recorded the session. Any fair reading of the transcript of the meeting can only lead to the conclusion that Rubin was adamantly opposed to the Union and felt that Goulet was responsible for the organizing drive.

The day before the Union election, Rubin addressed a meeting of all employees and, among other things, stated that the restaurant would have to close if it became unionized, that if the Union lost the election, he could increase benefits, but if the Union won and he had to raise wages, he could put up a "no tipping sign." The Union lost the election decisively on October 11.

After the election, Provost was questioned at different times by other employees as to if and when Goulet would be

---

2. Provost had been transferred back in July of 1975. He reestablished the head waitress position and appointed one Carol Urban to the job.

discharged. The common thread running through all of Provost's replies was that Goulet would be terminated when the time was right. He stated, in response to one inquiry, that ninety days was the waiting period. Sometime in late fall or early winter, Goulet was told by the Assistant Manager, Bert Moquin, that she and three other employees were "on the company's shit list."

Goulet was discharged on January 22, 1976, a little more than ninety days after the Union election. Rappaport told Goulet that, because business was slow, she was one of several who had to go. He also said that the discharge was due to Goulet's performance and attitude. Goulet then went to see Rubin, who also told her that the reason for the discharge was business conditions and that her work "wasn't like it used to be." When Goulet asked him if she would be recalled if business improved, he replied that he didn't think so.

The next day, January 23, 1976, Charlotte Manegre, another waitress, was also discharged. The reasons given her by Rappaport were a slowdown in business and complaints about her appearance and attitude. Manegre had started as a salad girl in 1972 and became a waitress in 1974. She was considered a satisfactory employee and had only been reprimanded once for poor work performance.

Provost, who had been on vacation when Goulet and Manegre were discharged, resigned from the company on January 26. He testified that, shortly thereafter, Rappaport informed him that Manegre had been discharged to cover up the firing of Goulet. Waitress Shirley Kernan testified that Rappaport told her and waitress Urban and Deveau that Manegre's firing was a cover-up for the discharge of Goulet when all of them were having coffee in late January or early February of 1976 at a nearby restaurant.

The company hired an additional four waitresses between January and May of 1976, but neither Goulet nor Manegre was recalled.

During the investigation of the unfair labor practice charges, a Board agent visited waitress Dalton at her home. Dalton telephoned Rappaport and inquired if she should talk to the agent. Rappaport told her to do so. Thereafter, she was telephoned by Rubin on three separate occasions relative to the Board interview. He asked her what questions were asked and she told Rubin what had been discussed.

## FINDINGS AND RULINGS

We have carefully scrutinized the record and the opinion of the administrative law judge, which is detailed, comprehensive and well-written. There is substantial evidence to support each of his findings. In fact, the evidence would sustain a reasonable doubt finding against the respondent.

We have recently expressed some concern with the Board's failure to apply this circuit's formulation of the law when a charge of unlawful discriminatory treatment resulting in a discharge has been leveled and the respondent pleads and submits evidence of proper motivation. See e. g., *Hubbard Regional Hospital v. N.L.R.B.*, 579 F.2d 1251 (1st Cir. 1978); *N.L.R.B. v. Rich's of Plymouth*, 578 F.2d 880 (1st Cir. 1978); *Coletti's Furniture, Inc. v. N.L.R.B.*, 550 F.2d 1292 (1st Cir. 1977).

In this case, which was tried before *Coletti's Furniture* was published, the administrative law judge specifically found:

> I am utterly persuaded that Goulet's discharge was planned and decided upon long before Engstrom's "evaluations" and that those "evaluations" were utilized as a mere pretext to afford papered-over plausibility to its long-standing determination to rid itself of her because of her Union organizing activity, *and that she would not have been discharged but for that activity.* The proof to that effect is overwhelming and irresistible, and I so find.

App. at 40. (emphasis added).

With regard to Manegre's discharge, he found:

> Upon the record presented, I fully credit the cumulative strongly corroborated

testimony of the indicated witnesses, in preference to Rappaport's lone denials and professed failures of recollection, that Rappaport did indeed state and admit the true fact that Charlotte Manegre was discharged, under the circumstances described and found, to cover up Respondent's practically simultaneous discharge of Goulet because of the latter's protected concerted Union activities.

App. at 44.

With this proper application of the law by the administrative law judge, and an affirmance by the Board, both supported amply in the record, we will not substitute our judgment on issues involving credibility for that made by the ones to whom that function is assigned.

■ The company bases its allegations of impropriety, bias and lack of due process first on the administrative law judge's failure to credit the testimony of respondent's witnesses. This was, of course, a credibility judgment that rested primarily with the administrative law judge. We must observe, however, that our reading of the cold record does nothing to instill confidence in the testimony of the company's witnesses. The administrative law judge demonstrated clearly that there was no substance to the company's claim that business conditions warranted the discharges of Goulet and Manegre. The transcript of the tape-recorded interview between Rubin and Goulet makes it evident that Rubin felt that Goulet's union activities were reprehensible and something that he would not tolerate. An employer so blinded by his own views is bound to have his credibility doubted.

■ The charges of impropriety, bias and lack of due process arise from the language used by the administrative law judge in the course of his opinion. There is no denying that some of the words and phrases are incisively descriptive and damning to the respondent. Blander language would have been less stinging, but also less accurate. There was substantial evidence for finding that respondent had purposefully flouted the law. The firing of waitress Manegre was particularly petty and vindictive. We can understand the determination of the administrative law judge to use vivid colors in portraying the conduct of the officers of the respondent company. We find no merit in the allegations of impropriety, bias and lack of due process on the part of the administrative law judge.

*The order of the National Labor Relations Board shall be enforced.*