**LIBERTY MUTUAL INSURANCE COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 78–1215.

United States Court of Appeals, First Circuit.

Argued Oct. 4, 1978.

Decided Feb. 13, 1979.

Kalvin M. Grove, Chicago, Ill., with whom Burton L. Reiter, and Fox & Grove, Chicago, Ill., on brief, for petitioner.

Christopher W. Katzenbach, Atty., Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and John H. Ferguson, Atty., Washington, D. C., were on brief, for respondent.

Before COFFIN, Chief Judge, ALDRICH and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

Liberty Mutual Insurance Company (Company) brings this petition to set aside an order of the National Labor Relations Board (Board or NLRB) issued on May 3, 1978.[1] The Board has filed a cross-application for enforcement of its order: that the Company cease and desist from the unfair labor practices found; that the Company offer reinstatement and reparation to discharged employee Martin J. Agacinski, Jr.; and that the Company reimburse Agacinski for all legal expenses incurred in defending the state court suit brought by the Company subsequent to his discharge. In that action, Liberty Mutual successfully sought to enjoin Agacinski from selling insurance in competition with it.[2] The Board adopted the findings of the administrative law judge (ALJ), concluding that the Company violated section 8(a)(3) and (1) of the Labor Relations Act, 29 U.S.C. § 8(a)(3) and (1), when it discharged account representative Agacinski and it violated section 8(a)(1) of the Act, 29 U.S.C. § 8(a)(1), when Liberty Mutual threatened Agacinski with discharge because of his union activities.

The Company alleges that the Board's findings of 8(a)(3) and 8(a)(1) violations are not supported in the record considered as a whole and that the award of attorney's fees in the state court proceeding was contrary to law.

This case does not fit into the traditional mold of subpar employee work performance being tolerated by the Company until it coincides with union organizational activity. There was no established labor union involved here directly or indirectly. The discharged employee was attempting to resolve personal grievances at the same time that he was engaged in an organizing effort of insurance salesmen. For this reason, it is necessary to develop the facts in detail.

The Company has its headquarters in Boston, Massachusetts, and is engaged in the sale of casualty, property, and life insurance. Agacinski, the discharged employee around whom this controversy centers, worked for the Company continuously from 1962 until his termination in March of 1976. During his years with Liberty Mutual, he

---

1. *Liberty Mutual Ins. Co. and Martin J. Agacinski, Jr., an Individual*, 235 N.L.R.B. No. 197 (1978).

2. The administrative law judge did not award attorney's fees because he determined that Agacinski's state court suit had no direct or proximate nexus with the discharge. Additionally, the ALJ noted that the state suit was still pending and that Agacinski's counterclaim for legal expenses could conceivably be granted. The Board disagreed, and awarded legal fees.

advanced from personal sales representative in Morristown, New Jersey, to business sales representative in 1971, when he was transferred to East Orange, New Jersey. He was lauded for his "outstanding sales efforts" in 1973 in a letter from the Boston office. In 1975, Agacinski was the Company's highest earner for the State of New Jersey, and was cited as an example by his manager to fledgling salesmen. January of 1976 brought a promotion to account representative.

Even though he appeared to be on the road to success in the insurance world, Agacinski was not happy with the way the Company treated him and its treatment of insurance salesmen in general. He set forth his grievances in a memorandum, dated March 11, 1976, addressed to his superior, District Manager Joseph Anthony. The memorandum was composed during the first two weeks of March while Agacinski was on vacation. Agacinski distributed the four page memorandum on March 15 to all salesmen and managers in the East Orange office and to insurance salesmen throughout the Middle-Atlantic Division on his return from his vacation. He detailed his complaints and proposed the formation of an association of salesmen.

> Our representatives, including myself, are distrustful and disheartened. I propose a Liberty Mutual sponsored Association of Middle-Atlantic Representatives; an association in which representatives are appointed by ballot of their peers to voice grievances to management.

His grievances were both general and personal. The general complaints included dissatisfaction with the assignment of sales territories, reassignment of accounts, low renewal percentages, conflicts between salesmen and sales managers, and distortions in sales reports. Agacinski's personal complaints were prefaced with his statement, "I, like others, have personal grievances that, for fear of reprisal, cannot be aired without support of an Association." Agacinski was irked by what he viewed as an inequitable salary maintenance formula, secrecy concerning the tabulation of career credits, inner strife in his office, and a reduction in reimbursed expenses, such as mileage. With the distribution of this memorandum. Agacinski's career as a Liberty Mutual salesman began hurtling toward its end. Our factual focus is primarily on the brief time span from March 15 to March 26, when Agacinski's status as a shooting star in Liberty Mutual's galaxy ended abruptly with his discharge. Agacinski realized before he distributed the memorandum that his employment would be in jeopardy and during his vacation at the beginning of March made inquiries and determined that, if he lost his position with Liberty, he would have an opportunity to represent other competing insurance companies as an agent.

Late in the morning on Monday, March 15, Agacinski met with Anthony at the latter's bidding to discuss the memorandum. After requesting the names of individuals to whom the memorandum had been sent, Anthony commented to Agacinski, "you know, Marty, associations don't help superior salesmen. What they tend to do is force a company to keep lesser qualified people as opposed to letting them go. They have to allocate those funds for those lesser people and you end up more or less receiving less money." They discussed Agacinski's grievances, but came to no resolution, with accusations of each party's irrationality bandied back and forth.

Anthony phoned James L. Walker, the division sales manager for the Middle-Atlantic Division after his lengthy session with Agacinski to discuss the memorandum. Anthony also spoke with Kenneth Spaulding, the assistant vice-president and manager of employee relations, corporate level, in Boston about the memorandum.

On Tuesday afternoon, March 16, Agacinski met with three account representatives in the East Orange office to discuss his memorandum, suggesting a second follow-up memorandum. He wanted "to further the Association" so he proposed to the trio "the idea of a no-show Thursday." Agacinski then wrote a second memorandum, which he addressed and sent to all divisional

salesmen on Wednesday, March 17. Agacinski summarized the mixed reactions he received from the first memorandum: the senior salesmen "at best were sympathetic"; the newer salesmen "are ·enthusiastically behind organization and change"; the "newest salesmen are bewildered." Agacinski noted:

> Managements [*sic*] attitude has been similarly predictable. As in past attempts at organization, Home Office has dictated a low profile; a let them make a mistake attitude. Our Executive Vice-Presidents are as close to our attempted Association as they would be to the most critical of their responsibilities.

Citing the comment of one of the junior salesmen to the effect that Agacinski must have been intoxicated when he composed the first memo, Agacinski continued, "This level of effrontery left me no choice but to explain to Joe Anthony that because they could not be trusted, I was literally at war with management and would fight with all my effort for an Association of salesmen." Agacinski concluded by noting, "I am for decision and action," and proposed "the first of an indefinite number of 'no show Thursdays.' I will not work any Thursday till I am satisfied that we are accomplishing the resolution of some of our grievances."

After reading the second memorandum, Anthony phoned both Walker and Spaulding concerning its contents. Spaulding directed Anthony to gather the divisional sales managers for a meeting, which was held on the following day, Thursday, March 18, with Spaulding and Attorney Penny, counsel for the Company, in attendance.[3] The express purpose of the meeting, according to Spaulding's testimony was "for Mr. Penny and me to discuss with the managers their—what they could and could not do during any attempt to organize the East Orange office." Anthony testified by deposition that at the meeting he was directed not to make any threats of termination, but that he could insist that Agacinski function in the accepted manner of a Liberty Mutual · salesman.

Walker met with Agacinski on Friday, March 19, from about 11:00 a. m. until 2:00 p. m., during which time they addressed the contents of both memoranda and their distribution. When Walker noted his surprise at Agacinski's dissatisfaction with the Company and his attempt to form an association, Agacinski responded that, due to his high visibility as a successful salesman, "I am the most logical person to pursue this." When Walker questioned Agacinski if he intended to keep writing memoranda, Agacinski responded that he did. He then threatened to be "disruptive in an administrative sense at meetings," explaining that he could post a notice that no salesmen attend meetings unless prior written approval was obtained from the association. On hearing this, Walker warned Agacinski, "you know, you keep this up and you could lose your job." Agacinski retorted that the job was not any good and that he wanted it changed. Walker testified that he understood Agacinski's primary motive in creating a ruckus was to satisfy his personal grievances.

Walker met with Anthony after the meeting, then on his journey back to Pennsylvania he dictated a memorandum to Division Manager Hytha, summarizing what transpired at the meeting. Walker recalled that Agacinski presented the Company with three alternatives: (1) correct his major grievances (*i. e.*, salary maintenance, renewal service, career and territorial aspects), (2) permit the formation of an association, or (3) pay Agacinski $25,000. Walker rejected the first two alternatives and he noted that Agacinski promptly dismissed the third, and "he did not continue to press it as a viable alternative." Walker concluded the memorandum with this opinion:

> I am convinced that he will continue to pursue this type of course of action to cause management continuing problems and concern until he achieves his objectives, or until we terminate his employment.

---

**3.** Unlike the Board we attach no sinister or improper motive to this legal "watch." *See*

*NLRB v. Lowell Sun Publishing Co.*, 320 F.2d 835, 842 n.* (1st Cir. 1963).

I recommend we find the appropriate circumstances to properly terminate his employment and do so at the earliest opportunity.

Agacinski failed to meet with a business client on Friday, March 19, at 11:00 a. m. because he was in conference with Walker. He directed his sales assistant, Dorothy Neville, to reschedule his two afternoon appointments for Wednesday, March 24.

On Monday, March 22, Agacinski did not attend the 8:30 a. m. sales meeting. His testimony was that he was not compelled to attend since the meetings were not mandatory, and he had a business appointment scheduled for that morning at 11:00 a. m., requiring him to leave the office at 9:30 a. m. Agacinski sold two policies that morning at the 11:00 a. m. appointment. Anthony testified that these sales meetings were mandatory, but conceded that in prior weeks they had been conducted solely for junior salesmen. Anthony did not try to contact Agacinski to demand his presence at the meeting, nor did he question him subsequently concerning his absence. He explained that he did not do so because Agacinski was avoiding management and because his schedule and Agacinski's did not mesh. Anthony did, however, call both Spaulding and Walker that afternoon to report Agacinski's absence.

On Monday, March 22, Agacinski, according to his testimony, sensed his impending fate, and he removed from his office his only two items of personal significance, a photograph of his seven children and his "Liberty leader" pen. He explained that he did this to avoid the humiliation of gathering his belongings in disgrace before his coworkers, which he had witnessed when others were discharged.

Agacinski reported to work on Tuesday, March 23, but left at about 4:00 p. m., explaining to Neville, his sales assistant, that he was sick. He left his briefcase in his cubicle, and as Neville had rescheduled his appointments from the previous Friday to that Wednesday, he testified that he expected her to cancel them for him. This she did not.

Agacinski did not report to work on Wednesday, March 24, nor did he keep his appointments. He testified that he was physically sick on the morning of the 24th. Neither Neville nor anyone else from the Company phoned Agacinski to check on his health and his ability to meet with clients. At Anthony's direction, Neville phoned the customers whom Agacinski was scheduled to see on the 24th to determine if he kept his appointments. Upon learning that he did not, Anthony called Spaulding and told him that Agacinski was not returning phone calls, not keeping appointments, and was not servicing policyholders. In response to this information, Spaulding called a meeting in Boston at 3:00 p. m. during which a conditional decision was made to discharge Agacinski if he did not meet with Anthony the next day and behave as a Liberty Mutual salesman. Counsel for the Company instructed Anthony by phone at 4:00 p. m. to direct Agacinski to report to his office on Thursday, March 25. Anthony was told to warn Agacinski that he was to behave as a Liberty Mutual salesman; that he would be discharged if he did not appear at Anthony's office; and to discharge Agacinski if he did not meet with him.

Anthony called Agacinski at 6:00 p. m. at the latter's home. There is a conflict in testimony as to what was said. Anthony testified that he told Agacinski that the Company had some problems with him: one was that he failed to attend the sales meeting; two, that he was going to miss certain days of work; and three, that it had come to Anthony's attention that he was not delivering services to the policyholders. Anthony told Agacinski that he was to meet with him at Anthony's office at 8:30 the following morning. Anthony further said, "Marty, if you don't come in and meet with me and discuss these you will be terminated." Agacinski's reply was, "Liberty can't do that, I have my sources. You wouldn't be that cavalier." Anthony responded, "Marty, I spoke to you as a manager for Liberty Mutual. Now let me tell you as a friend, you will be terminated if you don't meet with me in my office tomorrow morn-

ing." Agacinski's reply was, "I'm not going to come in, call me when Liberty changes its mind." Agacinski, according to Anthony, then hung up the phone. Agacinski testified: that Anthony told him we wanted to see him the following morning, that he was under the impression that the call was a message from the Chairman of the Board and that Anthony said, "The word has come down from the home office, Marty. This comes directly from the chairman of the board. You are to cease and desist your activities and behave as a Liberty Mutual salesman or you will be terminated." According to Agacinski, he replied, "Joe, I don't think that Liberty Mutual can be that cavalier," to which Anthony replied, "Marty, as a friend, I advise you start acting like a Liberty Mutual salesman."

Agacinski did not attend the meeting on Thursday because he believed this conversation amounted to a discharge. He testified that, after he hung up the telephone, he turned to his wife and stated, "that's the ball game, it's all over, we lose." The Company maintains that the final out did not occur until Friday, March 26, when it sent Agacinski his formal letter of termination.

Once discharged, Agacinski formed his own insurance agency and, in violation of an agreement with Liberty Mutual, he solicited insurance contracts from competitor insurance companies.[4] Due to his growing dissatisfaction at Liberty Mutual, Agacinski had explored the possibility of changing jobs during the three years prior to his discharge. Although he received some encouragement from other insurance companies, he was under no contractual relationship with any of them at the time of his discharge. Agacinski testified that he did not wish to be fired, nor did he intend to resign, for he had worked too hard for the past decade and a half to give up at this point. The ALJ credited Agacinski's testimony and rejected the Company's argument that Agacinski, forearmed as an independent insurance agent, in fact sought his own discharge.

4. In the state court action brought to enjoin Agacinski from selling insurance in violation of his noncompetition contract, Liberty Mutual

After a plot summary, the ALJ concluded in his decision that

Respondent discharged Agacinski on March 24, 1976, not because he had in any way embarked upon a series of "intermittent and partial strikes," but solely because he had engaged in concerted activities protected under the Act by soliciting and encouraging his fellow employees to form and join in an Association to better their working conditions.

The Company argues that the Board failed to shoulder its burden here for it merely introduced evidence of both protected and unprotected activity, without proving that, but for Agacinski's union activity, he would not have been discharged, citing *Coletti's Furniture, Inc. v. NLRB*, 550 F.2d 1292, 1293–94 (1st Cir. 1977).

The Board counters that there is substantial evidence in the record considered as a whole to support the finding of the Board that the business reasons offered by the Company were pretextual.

Our role in these cases is a limited one and the Board's findings of fact are conclusive if we find substantial evidence in the record as a whole to support them. 29 U.S.C. § 160(e); *NLRB v. Matouk Industries, Inc.*, 582 F.2d 125, 128 (1st Cir. 1978); *NLRB v. Universal Packaging Corp.*, 361 F.2d 384, 387 (1st Cir. 1966). In *NLRB v. Walton Manufacturing Co.*, 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962), quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951), the Court reiterated its mandate that the reviewing court may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." Because a showing that the employer's dominant motive in the discriminatory discharge was not a proper one is crucial, *NLRB v. Fibers International Corp.*, 439 F.2d 1311, 1312 (1st Cir. 1971), deference to the infer-

was granted injunctive relief. We are not called on here to pass on the merits of that case.

ences drawn by the ALJ who heard and observed the witnesses is proper. *P.S.C. Resources, Inc. v. NLRB*, 576 F.2d 380, 382 (1st Cir. 1978).

██ Due deference to the findings of the Board and the ALJ does not mean abdication of our duty of judicial review. *Universal Camera Corp. v. NLRB, supra*, 340 U.S. at 488, 71 S.Ct. 456; *Stone & Webster Engineering Corp. v. NLRB*, 536 F.2d 461, 464–65 (1st Cir. 1976); *Frattaroli v. NLRB*, 526 F.2d 1189, 1193 (1st Cir. 1975). We cannot ignore the business constraints under which an employer operates. We agree with the Second Circuit's observation in *Waterbury Community Antenna, Inc. v. NLRB*, 587 F.2d 90, 98–99 (2d Cir. 1978), that the Act was not passed to encourage pro-union activity, which is what would result should the courts place an employee in a better position as a result of his organizing activity than he would have occupied had he done nothing.

We have been diligent in requiring the Board to fully justify its finding that an employee was discharged in violation of the Act. *See Hubbard Regional Hospital v. NLRB*, 579 F.2d 1251, 1255 (1st Cir. 1978); *NLRB v. Rich's of Plymouth, Inc.*, 578 F.2d 880, 886–87 (1st Cir. 1978); *Coletti's Furniture, Inc. v. NLRB, supra*, 550 F.2d at 1293–94; *Stone & Webster Engineering Corp. v. NLRB, supra*, at 464–65; *NLRB v. Lowell Sun Publishing Co.*, 320 F.2d 835, 841 (1st Cir. 1963). Our oft repeated,[5] yet often ignored, test of whether a discharge was in violation of section 8(a)(3) of the Act is:

> When good cause for criticism or discharge appears, the burden which is on the Board is not simply to discover some evidence of improper motive, but to find an affirmative and persuasive reason why the employer rejected the good cause and chose a bad one. The mere existence of anti-union animus is not enough. The fact that the employer may be pleased to

effectuate the discharge does not mean that this was his primary motive. *NLRB v. Billen Shoe Co.*, 397 F.2d 801, 803 (1st Cir. 1968). We reiterated these guidelines for determining whether there had been an illegal discharge in *NLRB v. South Shore Hospital*, 571 F.2d 677, 682 (1st Cir. 1978).

██ The Board is required to show that the discharge was improperly motivated and, if, as here, the Company offers a legitimate business justification for its conduct, the Board has the burden of establishing by substantial evidence an affirmative and persuasive reason why the employer rejected the good cause and chose the bad one. The Company's "good cause" for discharging Agacinski was his insubordination, refusal to attend meetings, failure to properly service accounts, the threat of refusal to work on Thursdays, and his refusal to meet with Anthony on March 25. The "bad cause" was Agacinski's attempts to form an association of salesmen.

██ We recognize that the telescoped chain of events here and the blurred line between Agacinski's organizational efforts and his performance and attitude as an employee make the application of our "but for" test difficult. But it cannot be dispensed with by the incantation of the rubric that the Company's reasons for the discharge were "pretextual." Throughout his decision, the ALJ based his conclusion on a selective reading of the record, without resolving the differences in the testimony of Agacinski and the Company's witnesses. A credibility determination is not to be used as a rug under which is swept all conflicting testimony.

In concluding that Agacinski had already left for an appointment prior to the Monday sales meeting, the ALJ overlooked Agacinski's own testimony that he did not leave his office until 9:30 a. m. and that the meeting commenced at 8:30 a. m. The ALJ

---

5. For recent explications of this test, *see NLRB v. Jack August Enterprises, Inc.*, 583 F.2d 575, 578 (1st Cir. 1978); *Hubbard Regional Hospital v. NLRB*, 579 F.2d 1251, 1255 (1st Cir. 1978); *NLRB v. Rich's of Plymouth, Inc.*, 578 F.2d 880, 886–87 (1st Cir. 1978); *P.S.C. Resources, Inc. v. NLRB*, 576 F.2d 380, 383 (1st Cir. 1978); *NLRB v. So. Shore Hospital*, 571 F.2d 677, 682 (1st Cir. 1978).

found it telling that Anthony did not reproach Agacinski for missing the meeting, while ignoring testimony that Agacinski was avoiding management, that Agacinski left the office while Anthony was in the meeting and did not return until late afternoon, and that Anthony was in a meeting on Tuesday morning and Agacinski left the office that afternoon due to illness.

Particularly damning in the eyes of the ALJ was Walker's memorandum in which he concluded, "I am convinced that he will continue to pursue this type of course of action to cause management continuing problems and concern until he achieves his objectives, or until we terminate his employment." The ALJ seized on Walker's concession that, when he wrote the memorandum, Agacinski had not yet actually carried out his threats, and he concluded "this notation could only have reference to Agacinski's unconcealed attempts to organize Respondent's salesmen into an Association." Mindful of the deference given to the inferences drawn by the ALJ, we nevertheless are compelled in this instance to suggest that the ALJ's review of Walker's testimony was incomplete, presenting a distorted view of his position. After conceding that none of Agacinski's threats had as yet been carried out at the time the memorandum was dictated, Walker staunchly maintained that his ambiguous reference to Agacinski's "objectives" meant the resolution of his personal grievances and that he was convinced that Agacinski was sincere in his threats to be disruptive. When asked, point blank, whether he was referring to Agacinski's association attempt, Walker categorically denied that he was. He stated: "The thrust of his conversation with me and the interpretation I received from his remarks was that he wanted to have his personal grievances satisfied and he was using these methods as a threat or implied threat to secure these." We do not mean to imply that we would necessarily credit Walker's testimony, only that the ALJ was remiss in his treatment of it.

The Board attempts to bolster the decision of the ALJ by noting quite properly that, since direct evidence of an employer's improper motive is difficult to establish, the Board may infer intent from the circumstances. *NLRB v. South Shore Hospital, supra,* 571 F.2d at 682. *NLRB v. Bird Machine Co.,* 161 F.2d 589, 592 (1st Cir. 1947). The Board contends that the inference of improper motive in the discharge is supported on the following grounds: the Company did not distinguish between Agacinski's protected and unprotected activities; the timing of Agacinski's fall from grace and the inception of the organizing attempt; and the abandonment of standard company procedure in dealing with his transgressions.

The Company stated that it was stalwart in differentiating between Agacinski's protected and unprotected activities. It purposely did not discharge him when he circulated the two memoranda, and only resorted to the discharge when Agacinski, after not servicing clients and skipping a sales meeting, refused to meet with Anthony as requested.

The Board denigrates the Company's business justifications for the discharge, touting Agacinski's sterling sales record as an indication of the Company's illegal motive in the discharge. As we have emphasized in our past decisions, it is neither the Board's function, nor indeed ours, to second-guess business decisions. " 'The Act was not intended to guarantee that business decisions be *sound*, only that they not be the product of antiunion motivation [emphasis in original].' " *NLRB v. Rich's of Plymouth, Inc., supra,* 578 F.2d at 887 n.9, quoting from *Stone & Webster Engineering Corp. v. NLRB, supra,* 536 F.2d at 467. Although the discharge did come quickly on the heels of Agacinski's association attempt, so did his threats of disruptive conduct and refusal to work, so that the timing of the discharge is not conclusive.

The ALJ found that "Anthony was directed by Grove to discharge Agacinski on March 24 [6] if he failed to report to Anthony

---

6. We assume that the phrase "on March 24" was inadvertently misplaced in the sentence.

on March 25 to discuss his activities on behalf of the Association, as Agacinski did." The Board contends that Agacinski was effectively terminated on March 24, while the Company insists that the termination did not occur until March 26 when Agacinski received a formal letter of termination.

"The test of whether or not an employee has been discharged depends upon the reasonable inference that the employees could draw from the language used by the employer." *NLRB v. Hale Mfg. Co., Inc.*, 570 F.2d 705, 708 (8th Cir. 1978). This test has been generally accepted. *NLRB v. Central Oklahoma Milk Producers Ass'n.*, 285 F.2d 495, 498 (10th Cir. 1960); *NLRB v. Cement Masons Local No. 555*, 225 F.2d 168, 172 (9th Cir. 1955).

■■■ Anthony's instructions were to tell Agacinski to report to Anthony's office on Thursday, March 25, and, if he failed to do so, to discharge him. Agacinski's own version of the phone call acknowledged that Anthony told him, "Marty, I want to see you tomorrow morning." Agacinski's interpretation of the phone call as a dismissal was, in our opinion, unreasonable. He was not told that he was fired, only that he would be if he did not "behave as a Liberty Mutual salesman." The Company, of course, had a right to insist that Agacinski fulfill his duties as a salesman. Agacinski's subjective reaction to the phone call is not the test. The test is one of reasonable inference to be drawn from it. It must be borne in mind that Agacinski had been anticipating his discharge since March 22 when he moved his personal items out of his office. The only reasonable inference that can be made based on Agacinski's testimony as to the phone call, which is what the ALJ credited, is that he *would* be fired if he did not cease and desist his activities, behave as a Liberty Mutual salesman, and meet with Anthony the next day. It seems clear to us, on Agacinski's own testimony, that he quit on March 24 after the phone call. The fact that Agacinski took the Company at its

word as to what it would do and assumed that he would be discharged does not move up the date of termination. Agacinski was not legally discharged until the date of the letter so notifying him from the Company.

■■■ Our examination of the record as a whole shows that the Company was probably motivated by two reasons to discharge Agacinski: his organizational activity and his personal rebellion against the Company. It is difficult to determine where one ends and the other begins. The bright line demarcation which both the Board and Company insist upon is simply not present. One of the difficulties inherent in the facts is that it is not clear whose grievances Agacinski was seeking to redress, his own or those of the salesmen as a group. Given these facts, it was especially important that the Board follow the standard of this circuit and determine whether the Company would have discharged Agacinski "but for" his union activity. Rather than remand, however, we have carefully examined the record, and conclude that the Company's motivating factor for firing Agacinski was his personal rebellion and his failure to perform his assigned duties.

■■■ This is not the end of our analysis. While the Act clearly insulates organizing activity from retribution by the employer, it does not authorize carte blanche action by an employee in pursuit of the lawful end of union organization.

■■■ Standing alone, Agacinski's distribution of the two memoranda and the solicitation of his co-workers was protected activity under section 7 of the Act, 29 U.S.C. § 157. However, when he threatened to be disruptive, declared war on management, missed appointments, and refused to meet with his superior as requested, he cast off the protective mantle of the Act and exposed himself to the disciplinary rigors of his employer. Partial strikes or intermittent work stoppages are not protected ac-

tivity,[7] nor are activities that are unlawful,[8] violent,[9] disloyal,[10] insubordinate,[11] or in breach of contract.[12] Agacinski's behavior, while not typifying all of the above, was clearly insubordinate and may be fairly categorized as constituting a partial strike, or "a strike on the installment plan." *C. G. Conn, Ltd. v. NLRB*, 108 F.2d 390 (7th Cir. 1939).

Agacinski's behavior was akin to that of the insurance agents in *Home Beneficial Life Insurance Co. v. NLRB*, 159 F.2d 280 (4th Cir.), *cert. denied*, 332 U.S. 758, 68 S.Ct. 58, 92 L.Ed. 344 (1947). The employees refused to report to their offices daily as the Company rules required, and instead, agreed among themselves to report only two days a week. The court held that the Company was justified in discharging the salesmen, holding "when, as here, they refuse to obey the rules laid down by a law-abiding management for the conduct of the business, they may be discharged and their places may be permanently filled." *Id.* at 284. *See NLRB v. Prince Macaroni Manufacturing Co.*, 329 F.2d 803, 809 (1st Cir. 1964), and *Raytheon Co. v. NLRB*, 326 F.2d 471, 475–76 (1st Cir. 1964), in which we held that an employee's violation of the employer's company rules justified their discharge. The court in *Home Beneficial Life Insurance Co. v. NLRB, supra*, 159 F.2d at 286, found the following language from *C. G. Conn, Ltd. v. NLRB, supra*, 108 F.2d at 397, instructive, as do we.

We are aware of no law or logic that gives the employee the right to work upon terms prescribed solely by him. That is plainly what was sought to be done in this instance. It is not a situation in which employees ceased work in protest against conditions imposed by the employer, but one in which the employees sought and intended to continue work upon their own notion of the terms which should prevail. If they had a right to fix the hours of their employment, it would follow that a similar right existed by which they could prescribe all conditions and regulations affecting their employment.

In *NLRB v. Montgomery Ward & Co.*, 157 F.2d 486 (8th Cir. 1946), the employees remained on their job but refused to handle any clerical work originating from another of the employer's plants which was on strike. The court held that the employees' refusal to keep the implied agreement on their part, to obey the reasonable instructions of the employer, was a proper ground for discharge.

While these employees had the undoubted right to go on a strike and quit their employment, they could not continue work and remain at their positions, accept the wages paid to them, and at the same time select what part of their allotted tasks they cared to perform of their own volition, or refuse openly or secretly, to the employer's damage, to do other work (citations omitted). *Id.* at 496.

7. *NLRB v. Insurance Agents' International Union*, 361 U.S. 477, 493–94, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); *NLRB v. Robertson Industries*, 560 F.2d 396, 398 (9th Cir. 1976); *Gen. Tire & Rubber Co. v. NLRB*, 451 F.2d 257, 259 (1st Cir. 1971); *NLRB v. Kohler Co.*, 220 F.2d 3, 11–12 (7th Cir. 1955); *Home Beneficial Life Ins. Co. v. NLRB*, 159 F.2d 280, 284 (4th Cir.), *cert. denied*, 332 U.S. 758, 68 S.Ct. 58, 92 L.Ed. 344 (1947); *NLRB v. Montgomery Ward & Co.*, 157 F.2d 486, 496 (8th Cir. 1946).

8. *Southern Steamship Co. v. NLRB*, 316 U.S. 31, 48, 62 S.Ct. 886, 86 L.Ed. 1246 (1942); *American News Co.*, 55 N.L.R.B. 1302 (1944).

9. *NLRB v. Fansteel Metallurgical Co.*, 306 U.S. 240, 252, 59 S.Ct. 490, 83 L.Ed. 627 (1939); *Florida Steel Corp. v. NLRB*, 529 F.2d 1225, 1234 (5th Cir. 1976); *Corriveau & Routhier Cement Block, Inc. v. NLRB*, 410 F.2d 347, 350

(1st Cir. 1969); *accord, NLRB v. Fibers International Corp.*, 439 F.2d 1311, 1314 (1st Cir. 1971).

10. *NLRB v. Local Union No. 1229, I.B.E.W.*, 346 U.S. 464, 477, 74 S.Ct. 172, 98 L.Ed. 195 (1953); *accord, NLRB v. Circle Bindery, Inc.*, 536 F.2d 447, 453 (1st Cir. 1976).

11. *Atlantic Telephone & Telegraph Co. v. NLRB*, 521 F.2d 1159, 1161 (2d Cir. 1975); *NLRB v. Thor Power Tool Co.*, 351 F.2d 584, 587 (7th Cir. 1965); *accord, NLRB v. Billen Shoe Co.*, 397 F.2d 801, 803 (1st Cir. 1968).

12. *NLRB v. Sands Manufacturing Co.*, 306 U.S. 332, 344, 58 S.Ct. 508, 83 L.Ed. 682 (1939); *NLRB v. Montgomery Ward & Co., supra*, 157 F.2d 496.

Based on both *Home Beneficial Life Insurance Co. v. NLRB, supra,* 159 F.2d 280, and *Montgomery Ward & Co. v. NLRB, supra,* 157 F.2d 486, we held in *General Tire & Rubber Co. v. NLRB,* 451 F.2d 257, 259 (1st Cir. 1971), "that an employee cannot do only part of her work, and be a partial striker in that sense." [13] Liberty Mutual asked nothing more of Agacinski than that he do his job, *i. e.,* "behave as a Liberty Mutual salesman" and meet with Anthony on Thursday, March 25. We find that Agacinski's behavior was not protected under the Act, and that Liberty Mutual was, therefore, free to terminate his employment.

We do not reach the issue of the propriety of the award of attorney's fees because there is no substantial evidence on which to base a finding of an 8(a)(3) or 8(a)(1) violation.

*The petition of Liberty Mutual to set aside the order of the National Labor Relations Board is granted. The Board's cross-application for enforcement of its order is denied and we order dismissal of the unfair labor practice charges.*

ALDRICH, Senior Circuit Judge (concurring).

While I fully concur in the court's opinion, and admire its careful compilation of authorities, I fear that this expenditure of our time is wasted on the Board. As these authorities, and the present case, reveal, the Board seems unable to recognize that as a matter of business judgment there can be only one course open to management when an employee persists in giving it the finger.

Equally, the Board has ignored our rule applicable to double motive cases, even now, after we pointed out in *Coletti's Furniture, Inc. v. NLRB,* 1 Cir., 1977, 550 F.2d 1292, 1293, that the Supreme Court had confirmed its correctness in *Mt. Healthy City Board of Education v. Doyle,* 1977, 429 U.S. 274, 285–87, 97 S.Ct. 568, 50 L.Ed.2d 471. In *Coletti's Furniture* we said that, in the

light of *Doyle,* "there can be little reason for us to rescue the Board hereafter if it does not both articulate and apply our rule." If the Board does not recognize the validity of our rule, it must, at the least, recognize the validity of our word. Neither employers, or this court, should be put to totally needless litigation.

---

**13.** In *General Tire,* we rejected the employer's argument that the discharged employee was a partial striker. There, the clerical employee crossed the picket line of the striking production department, but then refused the employer's command that she do the work of the striking production employees.