Kathleen BARRETT, Appellant,

v.

COVINGTON & BURLING LLP, Appellee.

No. 07–CV–1301.

District of Columbia Court of Appeals.

Argued March 11, 2009.

Decided Sept. 10, 2009.

served that—as he testified—he "saw her having difficulty walking on rounds," i.e., doing her job.

▐▌

Heather G. White, Washington, with whom George M. Chuzi was on the brief, for appellant.

James E. McCollum, Jr., for appellee.

Before REID, FISHER, and BLACKBURNE–RIGSBY, Associate Judges.

FISHER, Associate Judge:

Appellant Kathleen Barrett sued the law firm of Covington & Burling, alleging that it had denied reasonable accommodations for her medical condition, subjected her to a hostile work environment, and terminated her employment, all in violation of the District of Columbia Human Rights Act. D.C.Code § 2–1402.11 (2001). The trial court granted summary judgment in Covington's favor, and this appeal followed. We affirm in large part, but reverse and remand for further proceedings with re-

spect to a portion of the reasonable accommodation claim.

## I. The Factual and Procedural Background

On September 23, 2002, appellee Covington & Burling LLP hired appellant Kathleen Barrett for a full-time position as a Programmer/Analyst in its Information Resource Services ("IRS") department. During her employment, Ms. Barrett experienced recurring medical problems, including chronic pancreatitis and a condition variously diagnosed as ulcerative colitis or Crohn's disease. Among other things, her condition made it painful for her to sit for long periods of time. We will not discuss her symptoms and treatment in detail, but it is fair to say that Ms. Barrett faced severe medical challenges during 2003, 2004, and 2005, the years relevant to this appeal.

In March 2003, she suffered a relapse of her condition, which led to a week of hospitalization and an additional week of recovery at home. Upon her return, and for some time thereafter, appellant requested certain accommodations, including a zero gravity chair, a modified desk, reduced hours, permission to telecommute, a flexible schedule, and an adjusted workload. Over the next few weeks, appellant orally repeated her request for a zero gravity chair on several occasions.

In May 2003, appellant was again hospitalized for a week. On June 3, 2003, her physician signed a form releasing appellant to return to work at reduced hours, and from June 2003 to February 2004, appellant worked a schedule of thirty hours per week. Appellant provided her supervisor with additional written medical information—including documentation of her need for a zero gravity chair—on June 17, 2003. Covington ordered the chair and

desk appellant had requested on June 30, 2003, and July 6, 2003, respectively, and the items arrived on July 1, 2003, and August 1, 2003.

Over the coming months, appellant took additional leave due to her condition. In November 2003, appellant missed two weeks of work while recuperating from surgery. Then, beginning in February 2004, appellant took a medical leave of absence. Appellant was hospitalized for three weeks in February 2004, and in May 2004 she underwent surgery which resulted in an extended period of recovery.

On July 23, 2004, appellant spoke with Mary Ellen Carter, appellee's Human Resources Director, regarding her possible return to work and the prospect that she would be terminated if she could not resume a full-time schedule. In response to this conversation, appellant's attorney sent a letter dated August 11, 2004, requesting that appellant be allowed to telecommute at times and to work a modified schedule. Covington responded in an August 23, 2004, letter which stated in part that it had "concluded the requested accommodations are not consistent with the essential duties of [appellant's] position." The contents of these communications will be discussed in more detail later in this opinion.

In September 2004, Covington posted notice of a job opening for a Programmer/Analyst in the IRS Department. Internal documents revealed that this notice sought a "Replacement For: Katy Barrett."

Appellant did not return to work in September 2004. For several months thereafter, she had prolonged bouts of serious illness, followed by major surgery. After her recovery, and negotiation between the parties, appellant returned to work on a part-time basis on July 7, 2005.

In her complaint, filed on July 16, 2005, appellant alleged that, "[b]eginning on or around April 2003 and continuing until August 2004, [appellee] denied [appellant] a reasonable accommodation, subjected her to a hostile work environment, and terminated her employment in violation of the D.C. Human Rights Act's (DCHRA) prohibition against disability discrimination...."

The trial court granted appellee's motion for summary judgment as to all counts "on both statute of limitations and sufficiency of evidence grounds...." The court explained its ruling at an August 23, 2007, hearing, holding that: the actions appellant complains of "are not severe or persuasive [enough] under the case law" to constitute a hostile work environment; appellee provided reasonable accommodations to appellant, who "failed to prove that the essential functions of her job could have been performed even with the accommodations"; appellee did not terminate appellant; and all of the appellant's claims fall outside the statute of limitations.

## II. Standard of Review

▮▮▮▮ When "reviewing a trial court's grant of summary judgment, we make an independent review of the record and employ the same standards as does the trial court in initially considering the motion." *EastBanc, Inc. v. Georgetown Park Associates II, L.P.*, 940 A.2d 996, 1001 (D.C. 2008). Our review centers on "whether the party awarded summary judgment demonstrated that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *National Ass'n of Postmasters of the United States v. Hyatt Regency Washington*, 894 A.2d 471, 474 (D.C.2006). "We cannot, nor can the trial court, resolve issues of fact or weigh evidence at the summary judgment stage." *Anderson v. Ford Motor Co.*, 682

A.2d 651, 654 (D.C.1996) (internal quotation marks and citation omitted). However, "[i]n order to avoid summary judgment, there must be some 'significant probative evidence tending to support the complaint'...." *Lowrey v. Glassman*, 908 A.2d 30, 36 (D.C.2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). " '[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.' " *Brown v. George Washington University*, 802 A.2d 382, 385 (D.C.2002) (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505) (citations omitted).

### III. Appellant's Hostile Work Environment Claim Was Barred by the Statute of Limitations

Appellant contends that the trial court erroneously dismissed her hostile work environment claim on summary judgment, arguing that her claim was not time-barred as the trial court found. According to appellant, a July 23, 2004, conversation with Mary Ellen Carter, Covington's Director of Human Resources, in which Carter told appellant "that she would be terminated if she could not return to the office on a full-time basis ...," was the final incident in a pattern of "unlawful and abusive pressure on Ms. Barrett ... expressly premised on [her] disabilities and need for accommodation."[1] Because the Carter conversation falls within the statute's one-year limitation period,[2] she argues, all of the incidents which collectively comprised a hostile work environment should have been considered even if they occurred more than one year before her complaint was filed.

■■ To make out a claim under the DCHRA for creating a hostile work environment, a plaintiff must prove "(1) that [she] is a member of a protected class, (2) that [she] has been subjected to unwelcome harassment, (3) that the harassment was based on membership in the protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment." *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 888 (D.C.2003) (en banc) (citation omitted). A work environment is actionably hostile "when the workplace is permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment...." *Id.* at 889 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)) (citation and quotation marks omitted).

The Supreme Court has held "that consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible ... *so long as an act contributing to that hostile environment takes place within the statutory time period.*" *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (emphasis added). We explicitly adopted this approach in *Lively*. 830 A.2d at 890. Thus, in order

---

1. Appellant argued below that "the Huvelle letter," sent in August 2004, also contributed to a hostile workplace. Because appellant limits her argument on appeal to the Carter conversation, we have similarly constrained our analysis.

2. The DCHRA requires that a claim be filed within one year of the occurrence of the unlawful act. D.C.Code § 2–1403.16(a) (2001). Ms. Barrett filed this action on July 16, 2005, within one year of her July 23, 2004, conversation with Ms. Carter.

to survive summary judgment on timeliness grounds, appellant had the burden of establishing that there was a genuine issue of material fact as to whether the Carter conversation contributed to a hostile work environment.

 On this record, we agree with the trial court that something more than the July 23, 2004, conversation with HR Director Carter was necessary to avoid the bar of the statute of limitations. In order to render the earlier incidents timely, the conduct which falls within the limitations period must contribute to a hostile environment—an environment which is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Daka, Inc. v. Breiner*, 711 A.2d 86, 93 (D.C.1998) (citations and punctuation omitted). The claim "must be based on a series of separate acts ... that are so objectively offensive as to alter the conditions of the victim's employment." *Harris v. Wackenhut Servs., Inc.*, 590 F.Supp.2d 54, 77 (D.D.C. 2008) (citations and punctuation omitted). Moreover, the allegedly hostile incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 n. 1, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citation omitted). "[I]solated incidents of offensive conduct do not amount to actionable [workplace] harassment." *Smith v. Jackson*, 539 F.Supp.2d 116, 138 (D.D.C. 2008) (citation omitted).

The trial court ruled on alternative grounds, concluding that none of the incidents about which appellant complained made out a hostile work environment claim, but we need not decide that broader issue. Assuming, without deciding, that the more remote incidents appellant cites

actually occurred, and were sufficiently severe or pervasive to alter the conditions of her employment, the conversation with Ms. Carter could not reasonably be seen as contributing to actionable workplace hostility. Accordingly, appellant's claim is time-barred.

According to appellant, the Carter conversation contributed to a hostile work environment because "Ms. Barrett was told that she would be terminated if she could not return to the office on a full-time basis by the date mandated by Covington, and against medical advice." We are not persuaded. First, as appellant acknowledges, she had been out on medical leave for at least five months—since February of 2004—when the July 23, 2004, conversation with Ms. Carter took place. Indeed, that conversation involved the terms of appellant's return to Covington after her extended absence. The conversation with Ms. Carter simply was not part of the work environment—appellant had not been in the workplace for months.

In any event, the discussion with Ms. Carter was hardly "hostile" as that term has been construed in relevant case law. The communication was, by all accounts, a professional and amiable interchange between an employee and an HR Director discussing the terms of appellant's return to work. According to Ms. Barrett's own testimony, Ms. Carter said that Covington would be "thrilled to have [Ms. Barrett] back...." When Ms. Barrett said that she was "excited to come back to work," Ms. Carter responded that "we'd love to have you back." There is no indication that Ms. Carter used abusive or inappropriate language or behaved in an objectively hostile fashion in the course of her conversation with Ms. Barrett. Indeed, it is difficult to imagine how Ms. Carter could have conveyed the terms of Ms. Barrett's return to work in a less hostile fashion.

Furthermore, the Carter conversation bears little, if any, relation to the earlier events which appellant alleges created a hostile work environment. Ms. Barrett contends that her workplace was actionably hostile because of various disparaging comments made by her supervisors, Ashley and Schroeder, and the "delays and attitude" of "upper management" in response to appellant's requests for accommodation. The only continuity between the Carter conversation and the earlier incidents appellant cites is not severe or pervasive hostility, but the recurring topic of appellant's requests for accommodation.

The mere fact that Ms. Carter indicated that Covington would not accommodate appellant with a 30-hour work week after September 15, 2004, does not transform a failure to accommodate claim into a hostile work environment claim. Permitting this transmutation "would significantly blur the distinctions between both the elements that underpin each cause of action and the kinds of harm each cause of action was designed to address." *Rattigan v. Gonzales,* 503 F.Supp.2d 56, 82 (D.D.C.2007). *See also Smith,* 539 F.Supp.2d at 138 ("[I]nsofar as Plaintiff attempts to base his hostile work environment claim on his [compressed work schedule] revocation and AWOL charge, he cannot simply regurgitate his disparate treatment claims in an effort to flesh out a hostile work environment claim.") (punctuation and citation omitted). *Accord, Keeley v. Small,* 391 F.Supp.2d 30, 51 (D.D.C.2005) ("[P]laintiff's alleged 'hostile' events are the very employment actions he claims are retaliatory; he cannot so easily bootstrap alleged retaliatory incidents into a broader hostile work environment claim.").

In sum, we agree with the trial court that no reasonable jury could find that the conversation with HR Director Carter on July 23, 2004, which by all accounts was polite and cordial (albeit unsatisfactory to appellant), contributed to a hostile work environment. *Cf. Morgan,* 536 U.S. at 120–21, 122 S.Ct. 2061 (plaintiff presented evidence "that managers made racial jokes, performed racially derogatory acts, made negative comments regarding the capacity of blacks to be supervisors, and used various racial epithets"; "[C]ourt of [A]ppeals concluded that the pre-and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers[,]" and the Supreme Court could not say that acts occurring outside the filing period "are not part of the same actionable hostile environment claim"); *Lively,* 830 A.2d at 895–96 (where supervisor demeaned abilities and intelligence of women over many years, supervisor's instructing female plaintiff within limitations period to submit to diagnostic testing at brain dysfunction center could be considered part of one unlawful employment practice). Thus, appellant's hostile work environment claim was barred by the statute of limitations.

## IV. Most of Appellant's Reasonable Accommodation Claim Is Barred by the Statute of Limitations

In her July 16, 2005, complaint, appellant alleges that "[b]eginning on or around April 2003 and continuing until August 2004, [appellee] denied [her] a reasonable accommodation...." Ms. Barrett points to several incidents in support of her claim that Covington failed to reasonably accommodate her disability, including: a March 2003 denial of her request to work on a part-time basis and/or telecommute for part of the week; delay in providing her with a zero gravity chair and modified desk from March 2003 through June 2003; a denial of her June 2003 request that she be allowed to bring her own ergonomic equipment into the office; failure to allow

her to work from home in June 2003; the denial of repeated requests between April 2003 and February 2004 for permission to telecommute and/or work on a modified schedule; and a July 2004 conversation and an August 23, 2004, letter in which Covington allegedly refused to reasonably accommodate her disability.

■■■■■ Appellant encourages us to consider her allegations as a whole, arguing that we should transplant the continuing violation doctrine applied to hostile work environment claims into the context of failure to accommodate claims. Unlike a hostile work environment claim, however, a reasonable accommodation claim is based on discrete acts, not on prolonged or repeated conduct. Consequently, we reject appellant's invitation to treat failure to accommodate claims in the same way as hostile work environment claims, and instead adopt the approach taken by the United States Supreme Court in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), and applied to the context of reasonable accommodations by the First Circuit in *Tobin v. Liberty Mutual Insurance Co.*, 553 F.3d 121 (1st Cir.2009), and by the United States District Court in *Long v. Howard University*, 512 F.Supp.2d 1 (D.D.C.2007), *aff'd, Long v. Howard University*, 384 U.S.App. D.C. 21, 550 F.3d 21 (2008).

In *Morgan*, the Court considered a claim of racial discrimination under Title VII and held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges...." 536 U.S. at 113, 122 S.Ct. 2061; *see id.* ("The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about relat-

ed discrete acts *so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.*") (emphasis added). Relying upon *Morgan*, the First Circuit concluded that the continuing violation doctrine does not apply to reasonable accommodation claims. *See Tobin*, 553 F.3d at 130–31. The *Tobin* court held that:

> the denial of a disabled employee's request for accommodation starts the clock running on the day it occurs.... [S]uch a denial is a discrete discriminatory act that, like a termination, a refusal to transfer, or a failure to promote, does not require repeated conduct to establish an actionable claim. Consequently, the continuing violation doctrine does not apply to this case, and the timeliness of [a plaintiff's] claim turns solely on whether an actionable denial of his request for accommodations occurred during the limitations periods.

*Id.* (footnote omitted). In *Long v. Howard University*, the United States District Court for the District of Columbia held that "there is no principled basis for declining to apply *Morgan* to denials of requests for reasonable accommodation under the ... [Americans with Disabilities Act]." 512 F.Supp.2d at 16 (noting that "many courts have held that an alleged failure to provide a requested accommodation under the ... ADA is also a 'discrete act' under *Morgan* and thus cannot rest on a continuing violation theory to make it timely" (footnote omitted)).

We adopt the rationale of *Morgan, Tobin,* and *Long,* and hold that the continuing violation doctrine does not apply to reasonable accommodation claims. *See also Davidson v. America Online, Inc.,* 337 F.3d 1179, 1185 (10th Cir.2003) (applying *Morgan* to reasonable accommodation claims and holding that "plaintiffs are now expressly precluded from establishing a

continuing violation exception for alleged discrete acts of discrimination occurring prior to the limitations period, even if sufficiently related to those acts occurring within the limitations period"); *Elmenayer v. ABF Freight System, Inc.*, 318 F.3d 130, 134–35 (2d Cir.2003) ("The rejection of a proposed accommodation is a single completed action when taken" and the continuing violation doctrine is therefore inapplicable.); *Isse v. American University*, 540 F.Supp.2d 9, 28 (D.D.C.2008) (deciding that with respect to discrimination based on religion, "a rejection of a request for an accommodation is a 'discrete act of discrimination' ... and not a 'continuing violation'"); *Blanchet v. Chevron/Texaco Corp.*, 368 F.Supp.2d 589, 598 (E.D.Tex. 2004) ("In contrast to a claim alleging a hostile work environment, the continuing violation doctrine does not apply to a claim based on discrete discriminatory acts.").[3]

Because the continuing violation doctrine does not apply to reasonable accommodation claims, a plaintiff cannot "reach back" and base a claim on otherwise time-barred incidents merely because they are connected to events which occurred within the limitations period. A one-year statute of limitations applies to claims alleging discrimination in violation of the DCHRA. *See* D.C.Code § 2–1403.16(a) (2001) ("A private cause of action pursuant to this chapter shall be filed in a court of competent jurisdiction within one year of the unlawful discriminatory act...."). Consequently, the statute of limitations bars any claim for relief based on denials of accommodation that occurred more than one year prior to the filing of appellant's complaint.

■ According to appellant's own pleading, the alleged discrimination did not extend beyond August 2004, and the vast majority of the actions Ms. Barrett complains of occurred more than one year before she filed her complaint. Appellant points to only two events that took place within the twelve months prior to appellant's July 16, 2005, complaint: appellant's July 23, 2004, conversation with Mary Ellen Carter (the content of which was described in a July 23 e-mail from Ms. Carter to Jeffrey Huvelle); and Mr. Huvelle's August 23, 2004, letter.

■ The parties hotly dispute whether, during July and August, Ms. Barrett requested a new accommodation, sought to resume her old 30–hour work schedule, or renewed a request previously denied. These distinctions are critical. A plaintiff cannot extend the limitations period by reiterating an identical request that was previously denied. *See Long*, 512 F.Supp.2d at 17 ("It is well-settled that '[m]ere requests to reconsider ... cannot extend the limitations periods ....'") (citation omitted), *aff'd*, 384 U.S.App. D.C. at 26, 550 F.3d at 26 ("[T]o the extent that [the] actions *were* merely a re-affirmation of any University action denying Long's requests ... the District Court properly explained that such claims were barred.") (emphasis in original); *Tobin*, 553 F.3d at

---

**3.** Alternatively, appellant asks that we adopt the position taken by the EEOC that "because an employer has an ongoing obligation to provide a reasonable accommodation, failure to provide such accommodation constitutes a violation each time the employee needs it." EEOC Compliance Manual, Directive 915.003 (July 2005). In *Morgan,* however, the Supreme Court declined to follow "the EEOC's discussion of continuing violations in its Compliance Manual," noting its previous holding "that the EEOC's interpretive guidelines do not receive *Chevron* deference." 536 U.S. at 110–11 n. 6, 122 S.Ct. 2061 (referring to *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). The discussion in text which establishes that denials of requests for accommodation are discrete acts is a sufficient rebuttal to this branch of appellant's argument.

131 ("It is settled that an employee may not extend or circumvent the limitations period by requesting modification or reversal of an employer's prior action." (citation omitted)).

 On the other hand, the revocation of a previously authorized accommodation is actionable. *See Woodruff v. Peters*, 375 U.S.App. D.C. 429, 436, 482 F.3d 521, 528 (2007) (holding that summary judgment was precluded where an employer's communication indicated that the employee "could no longer count on the accommodations the [employer] had *de facto* afforded" even where "it is far from clear such accommodations are reasonable"); *Alston v. District of Columbia*, 561 F.Supp.2d 29, 43 (D.D.C.2008) ("[T]he revocation of one's accommodations qualifies as an adverse action.") (citation omitted). Similarly, a claim based on the denial of a new request, made in light of changed circumstances, would not be time-barred. In either case, Ms. Barrett's request, and Covington's denial, would have to be evaluated on the merits.

 In order to establish a prima facie case of disability discrimination under the DCHRA, a plaintiff must demonstrate, among other things, that she is an individual with a disability, and that she can perform the essential functions of her position with or without a reasonable accommodation. *See Miller v. American Coalition of Citizens with Disabilities, Inc.*, 485 A.2d 186, 190–91 (D.C.1984); *see also Carr v. Reno*, 306 U.S.App. D.C. 217, 221, 23 F.3d 525, 529 (1994) ("[A]n individual with handicaps is 'qualified' if she can perform the essential functions of her position with reasonable accommodation."). If the plaintiff makes a prima facie showing, the employer must demonstrate that it reasonably accommodated the plaintiff's disability. In order to evaluate the reasonableness of a requested accommodation, one must understand the essential functions of the job.

Although it concluded that appellant's claims were time-barred, the trial court held in the alternative that: Covington "has provided reasonable accommodations to" appellant; Ms. Barrett "failed to prove that the essential functions of her job could have been performed even with the accommodations"; appellant "was not capable of working . . . even if the accommodations had been made"; and appellant's August 11, 2004, letter "made requests for reasonable accommodations, which . . . had been previously made."

Based on the record before us, and the briefs filed by the parties, we are not convinced there is no genuine issue of material fact regarding the merits of Ms. Barrett's claims based on events that occurred in July and August of 2004. Although it appears uncontested that appellant had a disability, the parties debate whether she was capable of performing the job even with a reasonable accommodation. We agree with appellant that this issue must be evaluated by focusing on her medical condition during those two months—not at some earlier or later time. Further inquiry into the essential functions of the job is also required.

We therefore remand for further consideration of whether those discrete acts constituted a failure to grant a reasonable accommodation in violation of the DCHRA.[4] The parties and the trial court should focus anew on whether, during July

---

4. The events which occurred outside the statute of limitations are no longer actionable, but they may provide context for appellant's timely claims. *See Morgan*, 536 U.S. at 113, 122 S.Ct. 2061 ("Nor does the statute [of limitations] bar an employee from using the prior acts as background evidence in support of a timely claim.").

and August, appellant was seeking a new accommodation or merely trying to revive a time-barred claim; whether appellant was a qualified individual under the DCHRA; whether Covington unreasonably revoked an accommodation previously granted; and whether Covington failed to reasonably accommodate Ms. Barrett's disability.

## V. Appellant Was Not Terminated

Finally, Ms. Barrett alleged that Covington wrongfully terminated her employment, thereby violating the DCHRA. She now contends that the trial court erred in granting summary judgment in favor of Covington on that claim.

In order to establish a *prima facie* case of an unlawful termination under the DCHRA,

> a plaintiff ... must demonstrate (1) that [s]he was a member of a protected class, (2) that [s]he was qualified for the job from which [s]he was terminated, (3) that h[er] termination occurred despite h[er] employment qualifications, and (4) that a substantial factor in h[er] termination was h[er] membership in the protected class.

*McFarland v. George Washington University,* 935 A.2d 337, 352 (D.C.2007) (citation and quotation marks omitted). " 'The test of whether or not an employee has been discharged depends upon the reasonable inference that the employees could draw from the language used by the employer.' " *Liberty Mutual Insurance Co. v. NLRB,* 592 F.2d 595, 604 (1st Cir.1979) (quoting *NLRB v. Hale Mfg. Co.,* 570 F.2d 705, 708 (8th Cir.1978)). "No formal discharge is required if the words or conduct of the employer would reasonably lead an employee to believe that he had been fired." *Elastic Stop Nut Division of Harvard Industries, Inc. v. NLRB,* 287 U.S.App. D.C. 287, 294, 921 F.2d 1275, 1282 (1990); *see*

*also Hale Mfg. Co.,* 570 F.2d at 708 ("The fact of discharge of course does not depend on the use of formal words of firing. It is sufficient if the words or action of the employer would logically lead a prudent person to believe his tenure had been terminated.") (citation and quotation marks omitted).

The test is objective, rather than subjective, however. The words or actions of the employer must *"reasonably lead* an employee to believe that he had been fired." *Elastic Stop Nut,* 287 U.S.App. D.C. at 294, 921 F.2d at 1282 (emphasis added). In *Liberty Mutual,* for example, the court held that the employee's "interpretation of the phone call as a dismissal was ... unreasonable" where "[h]e was not told that he was fired, only that he would be if he did not 'behave as a Liberty Mutual salesman.' " 592 F.2d at 604; *see id.* ("The fact that [the employee] ... assumed that he would be discharged does not move up the date of termination. [He] was not legally discharged until the date of the letter so notifying him from the Company.") "Mere threats of termination do not rise to the level of an adverse employment action because they result in no materially adverse consequences or objectively tangible harm." *Valles–Hall v. Center for Nonprofit Advancement,* 481 F.Supp.2d 118, 144 (D.D.C.2007); *see also Walker v. Washington Metropolitan Area Transit Authority,* 102 F.Supp.2d 24, 29 (D.D.C. 2000) ("for there to be an adverse employment action, there must be a 'significant change in employment status' ") (citation omitted).

Although Covington may have "threatened" to terminate Ms. Barrett if she did not return to work, her day-to-day status did not change; she still was absent from the workplace. There was no formal notice of termination, and no "last day" of

work. At oral argument, appellant's counsel could not tell us *when* the alleged termination occurred. Her brief is equally vague, asserting that "Ms. Barrett heard nothing further from Covington in her status as an employee after September 2004, and she was convinced she had been terminated."

The question thus becomes whether Ms. Barrett's communications with Covington could have led her to reasonably conclude that she had been fired. We find useful guidance in cases that have determined when a claim of wrongful termination accrues (and the statute of limitations begins to run). In *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), a college professor was denied tenure but "was offered a 1–year 'terminal' contract, with explicit notice that his employment would end upon its expiration." *Id.* at 258, 101 S.Ct. 498. The Supreme Court held that the limitations period began to run, not on his last day of work, but "at the time the tenure decision was made and communicated to Ricks." *Id.* (footnote omitted); *accord, Chardon v. Fernandez,* 454 U.S. 6, 8, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981) (statute of limitations began to run, not on last day of work, but when employees were notified "that a final decision had been made to terminate their appointments"). We followed *Ricks* and *Chardon* in *Stephenson v. American Dental Ass'n,* 789 A.2d 1248 (D.C.2002), holding that "the alleged wrongful discharge occurred when Stephenson was notified *unequivocally* of his termination." *Id.* at 1252 (emphasis added). *See also Smith v. United Parcel Serv. of America, Inc.,* 65 F.3d 266, 268 (2d Cir.1995) (the unlawful discharge occurs, and the statute of limitations begins to run, "on the date when the employee receives a definite notice of the termination.") (citations and quotation marks omitted).

Appellant relies on a number of communications from Covington to support her contention that she was terminated. One e-mail, dated July 23, 2004, recounted a conversation that occurred that day between Ms. Barrett and Mary Ellen Carter. Ms. Carter reported that she had told Ms. Barrett "she would have to return to work at least 30 hours per week by August 18th and full-time by September 15th and if either or both of those two things did not happen, her employment would be terminated." Ms. Carter noted that Ms. Barrett was hoping to return to work on the schedule outlined above, but could not promise that she would. On July 29, 2004, Ms. Carter e-mailed appellant Barrett, telling her "that we truly prefer to have you return but also have a serious business need for a full-time programmer/analyst...." Carter reiterated both of the conditions set forth in the previous conversation and stated: "If these conditions are not able to be met, we will discuss the termination of your employment."

Finally, appellant pointed to the August 23, 2004, letter sent by Jeffrey Huvelle, of Covington, to Tracy Gonos, an attorney representing Ms. Barrett. In this letter, Mr. Huvelle outlined both the medical difficulties faced by Ms. Barrett and the actions taken by Covington. The letter concludes with Mr. Huvelle stating that Covington "plan[s] to move forward to initiate the posting/recruitment process so that we will be able to hire a replacement without further delay if, as now seems likely, Ms. Barrett's condition precludes her from meeting the requirements for this position."

This letter was not the final word, however. Appellant's attorneys responded that Ms. Barrett "is unable to return to work in the absence of a reasonable accommodation" and "intends to file promptly a complaint of disability discrimination

under the District of Columbia Human Rights Act...." If Covington "wish[ed] to discuss possible alternative accommodations and/or alternatives to litigation [it was invited to] contact [appellant's attorneys] by September 10, 2004." These communications clearly referred to the possibility of termination, but they also left open the prospect that Ms. Barrett would return to work. The parties were in a negotiating posture.

Following the communications of July and August 2004, Covington posted a job opening for the position held by Ms. Barrett. Appellant argues that this action demonstrates that Covington was behaving as if it had terminated Ms. Barrett's employment. We do not agree. Mr. Huvelle's letter had, in essence, told Ms. Barrett that the job posting was part of a contingency plan that would enable Covington to hire a replacement *if* she was not able to return to work. Although the job was posted in September, there was no evidence in the record that Covington actually hired someone for the position. Moreover, beginning in September, Ms. Barrett was very ill for several months. After major surgery, her recovery, and further negotiations, Ms. Barrett returned to work at Covington in July of 2005 and worked a 20–hour work week. Nine days after returning to work, she filed this lawsuit.

These considerations lead us to agree with the trial court that "[t]he fact that there was a job announcement [wa]s not proof of the fact of her termination." Moreover, the trial court "[did] not consider the letter of [August] 23, 2004 as a termination[;] ... [o]n the contrary, I don't think there [wa]s any termi-

nation.... In fact, the history of the parties since that letter was written is contrary to any termination." [5]

Appellant protests that the court was impermissibly resolving a disputed issue of fact when it held that appellant had not been terminated. We disagree and hold, as the trial court did, that there was not sufficient evidence to allow a jury to return a verdict in favor of the plaintiff on her claim of wrongful termination. There was nothing sufficiently "final," "unequivocal," or "definite" in the communications from Covington that would reasonably lead appellant Barrett to conclude that she had been fired. Rather, like the employee in *Liberty Mutual*, Ms. Barrett simply "assumed that [s]he would be discharged...." 592 F.2d at 604. The Superior Court properly granted summary judgment to Covington on this claim.

## VI. Conclusion

We remand Ms. Barrett's reasonable accommodation claim for further inquiry as detailed above. In all other respects, the judgment of the Superior Court is hereby affirmed.

*So ordered.*

---

5. The trial court also concluded that Ms. Barrett was not a qualified individual protected by the DCHRA because she was not able to meet the requirements of the job. Since we hold that appellant was not terminated, it is not necessary to discuss this alternative ruling.